751 So.2d 783 (1999)
STATE of Louisiana
v.
Cedric D'Wayne HOWARD.
No. 98-KA-0064.
Supreme Court of Louisiana.
April 23, 1999.
*789 Nicholas Joseph Trenticosta, Gary Patrick Clements, New Orleans, Paula Mangini Montonye, Hamden, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Charles F. Wagner, District Attorney, Monique Yvette Metoyer, Thomas Rockwell Willson, James M. Buck, Alexandria, Counsel for Respondent.
TRAYLOR, J.[*]
On February 2, 1995, a Rapides Parish grand jury indicted the defendant, Cedric D'Wayne Howard, for the first degree murder of Rita Rabalais in violation of LSA-RS 14:30. After a trial by jury, the defendant was found guilty as charged. After a sentencing hearing, the same jury charged with determining the defendant's guilt unanimously returned a verdict of death. The jury found two aggravating *790 circumstances: (1) the offender had been previously convicted of an unrelated armed robbery; and (2) it was committed in an especially heinous, atrocious, or cruel manner.
This matter comes before us on direct appeal under Article V, Section 5(D) of the Louisiana State Constitution. Defendant raises 25 assignments of error, none of which have merit. Therefore, we affirm the defendant's conviction and sentence.[1]

FACTS
On October 24, 1994, Alexandria police officers, responding to a call from the victim's niece, discovered the severely battered body of 82-year-old Rita Rabalais hidden in her bedroom closet. After the Alexandria police department homicide division secured the scene, detectives took photographs, dusted for fingerprints, and recovered from the kitchen garbage can a knife, a knife sharpening rod, a blue hand towel, and a rubber glove bearing a latent palm print. The officers also recovered a piece of metal tubing, part of a Weedeater, from a wicker basket in the dining room.
An autopsy revealed that Rita had been stabbed multiple times and badly beaten. Her face and head were severely bruised and lacerated and repeated blows to the head had caused massive bleeding to the brain. In addition, Ms. Rabalais had suffered three other potentially fatal knife wounds: One on each side of the neck, severing both the carotid artery and a primary vein, and a stab wound to the left side which had penetrated six inches and lacerated the heart and one lung. The state's forensic pathologist found evidence of multiple blunt trauma, as well as of defensive wounds to the victim's arms. He verified that the victim's wounds were consistent with the type of injuries which would have been inflicted by the instrumentalities recovered at the scene.
During the investigation, the police questioned Ricky Swafford, a 14-year-old boy who lived near the victim. He testified at trial that a couple of nights before the murder he had been outside Lonnie Simmons' house with the defendant and several others as they were planning the crime. He also testified that, although the defendant did not say much in the conversation, he believed that the defendant was willing to assist in the robbery/murder. Ricky further recalled that he did not go to school on the morning of the murder and that as he was walking to his aunt's house, he saw Freddie Gradley in the back alley two houses down from the victim's. He described Gradley as wearing jeans and a white t-shirt which had a big red stain on it. Swafford did not see anyone else in the vicinity. Later, the police came to Ricky's house and interviewed him there, as well as at the detective division. On December 8, 1994, Ricky Swafford gave a statement to police about the conversation he had overheard.
Also on December 8, 1994, Detectives Don Weatherford, Jr. and Gary Billingsley interviewed the defendant, who was in Renaissance Detention Center at the time. The following morning, the same detectives took a taped statement from the defendant as part of the investigation. Defendant did not inculpate himself and was not arrested after his statement. However, on December 9, 1994, the detectives took Fredrick Gradley's statement, who confessed his own involvement, and implicated the defendant and four others. Gradley was arrested and warrants issued for the arrest of Jerry Joseph, Joseph General, Joseph Green, and defendant. These five defendants were indicted for first degree murder on February 2, 1995.
On June 22, 1995, Jerry Joseph entered a plea agreement with the state. The state agreed to reduce the charge against *791 him to manslaughter, in exchange for his truthful testimony against his co-perpetrators. Following Joseph's cooperation with police, four additional perpetrators were implicated and arrest warrants issued for Lonnie Simmons, Joseph Michael Elie, Frederick Demond Bush, and Daveon Deshan McCullough. These four defendants were indicted on the same first degree murder charge on July 20, 1995.
Joseph testified at defendant's trial that he had been present at the Eat A Bite Club when defendant and Fredrick Gradley were planning a break-in at a woman's house on Kelly Street. Joseph disclosed that Ms. Rabalais had been targeted because she was supposed to have a lot of money. He further testified that later that night he met Gradley, Joe General, Ced Howard and Joe Green (Joseph's cousin) on the corner of Chester Street. Also present were Mike Elie, Lonnie Simmons, Daveon McCullough, Fred Bush, and an individual who remains unidentified. While the others entered Ms. Rabalais' house, Joseph testified that he remained on the porch of a house across the street, drinking a 40-ounce beer. Shortly afterward Joseph went inside and saw the victim surrounded by the others. They were beating, kicking and stabbing the victim. At one point, as Ms. Rabalais held onto Gradley, defendant hit her over the head with a pipe. Joseph testified that he left the scene before the others stuffed her in the closet, but that he did observe General and some of the others wiping the walls and cleaning anywhere they had touched. Joseph further admitted that money was taken from the house and that he got $50.00.
Defendant did not testify at trial. However, before the jury entered the court-room to hear opening statements in the guilt phase, defendant addressed the court, claiming that he disagreed with his lawyers' strategy geared to ending trial with a life sentence for a crime he did not commit, and that he would prefer death to a life sentence. He then asked the judge to find him guilty.

PRETRIAL ISSUES

Assignment of Error No. 9
Defendant claims that the trial court erred when it found him competent to stand trial. On June 8, 1995, while detained in pretrial status, defendant suffered a cerebral aneurysm which required surgery. On September 8, 1995, defense counsel filed a motion for appointment of a sanity commission to determine if defendant was competent to assist in his own defense. The trial court appointed Dr. James W. Quillin and Dr. John MacMahon to examine defendant.[2] The doctors performed separate examinations on October 9, 1995 and on October 12, 1995.
Generally, a person who suffers from a mental disease or defect which renders him incapable of understanding the nature and object of the proceedings against him, of consulting with counsel, and of assisting in preparing and conducting his defense may not be subjected to trial. La.C.Cr.P. arts. 641-649.1; State v. Rogers, 419 So.2d 840, 843 (La.1982), citing Drope v. Missouri, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), and State v. Bennett, 345 So.2d 1129 (La.1977).[3] A *792 defendant has the burden to establish his incapacity to stand trial by a preponderance of the evidence. Cooper v. Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996) (states may require the accused to prove his incompetency to stand trial only by a preponderance of the evidence; a higher standard of "clear and convincing evidence" violates the Due Process Clause); State v. Frank, 96-1136 (La.10/4/96), 679 So.2d 1365 (Cooper invalidates 1990 La. Acts No. 755, amending La.C.Cr.P. art. 648 to require a finding of incompetency by "clear and convincing evidence.") While the district court may receive expert medical testimony on point, the ultimate decision of competency is for the court alone. La.C.Cr.P. art. 647; Rogers, 419 So.2d at 843; State v. Edwards, 406 So.2d 1331, 1342. "Moreover, the judge's determination of a defendant's present mental capacity is entitled to great weight and his ruling will be reversed only if it is clearly erroneous." Bennett, 345 So.2d at 1132. The determinations of the trial judge as to competency of defendant to stand trial are entitled to great weight on review and will not be overturned absent an abuse of discretion. State v. Brogdon, 426 So.2d 158, 167 (La.1983); State v. Rochon, 393 So.2d 1224, 1228 (La.1981).
Dr. Quillin reported his findings to the court at a hearing held on March 14, 1997. He noted that defendant, as a result of the cerebral aneurysm, had some impairment of his left hemisphere and evidenced some memory dysfunction.[4] Defendant also suffered from right hemparesis, or difficulty with motor function on the right side. The doctor found defendant's verbal functions showed some mild paraphasic error in his running conversation, which means that defendant would occasionally insert the incorrect word for the meaning he was trying to express. Additionally, defendant's semantic fluency, which tests a person's ability to name contents of a category, was below normal. The doctor found defendant alert and responsive, with no psychotic illness, abnormality of thought, depression, or suicidal thoughts. An intellectual function test placed defendant in the low normal range overall, with no mental retardation. Dr. Quillin assessed defendant's I.Q. at 82, which is in the low normal range.
The doctor did report that defendant may have difficulty listening to the testimony of others and informing his counsel of any misstatements in their testimony. However, the doctor found that defendant clearly understood the charges against him and the role of the judge, of the prosecutor, and of counsel. He also noted that defendant could recall and relate facts about his actions during the commission of the offense and had the ability to give a defense for his actions. Under the totality of the circumstances, Dr. Quillin opined that defendant was capable of standing trial.
Dr. John MacMahon reiterated that defendant understood his legal rights and the nature of the proceedings against him. Based on his evaluation of defendant, Dr. MacMahon found defendant mentally fit to stand trial, as well as competent at the time of the offense. Given this consensus *793 of medical opinion, the trial court found defendant competent to proceed.
Here, both doctors testified that defendant was capable of proceeding to trial. On the showing made, the trial judge does not appear to have committed manifest error in determining the instant defendant mentally competent to stand trial. This assignment lacks merit.

VOIR DIRE ISSUES

Assignment of Error No. 12
Defendant contends that the trial court erred in granting the state's challenges for cause regarding three potential jurors, Doris Ross, Mabeline White, and Emma Rachal, based upon their opposition to the death penalty. Defendant claims that the jurors had expressed a willingness to consider voting for the death penalty and had stated that they would follow the trial court's instructions as to the law.
A prospective juror is properly excluded for cause because of his/her views on capital punishment when the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); State v. Sullivan, 596 So.2d 177, 182 (La.1992), rev'd on other grounds sub nom. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The basis of exclusion under La. C.Cr.P. art. 798(2)(b), which incorporates the standard of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as clarified by Witt, is that the juror's views "would prevent or substantially impair him from making an impartial decision as a juror in accordance with his instructions and his oath." Witherspoon further dictates that a capital defendant's rights under the Sixth and Fourteenth Amendments to an impartial jury prohibits the exclusion of prospective jurors "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon, 391 U.S. at 522, 88 S.Ct. 1770. Moreover, notwithstanding La.C.Cr.P. art. 800(B), which states that a defendant cannot complain of an erroneous grant of a challenge to the state "unless the effect of such a ruling is the exercise by the state of more peremptory challenges than it is entitled to by law," both the United States Supreme Court and this Court have held that it is reversible error, not subject to harmless-error analysis, when a trial court erroneously excludes a potential juror who is Witherspoon-eligible, despite the fact that the state could have used a peremptory challenge to strike the potential juror. Gray v. Mississippi, 481 U.S. 648, 664, 107 S.Ct. 2045, 95 L.Ed.2d 622 (1987); Davis v. Georgia, 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976); State v. Craig, 95-2499 (La.5/20/97); 699 So.2d 865 (unpub. app. at 7).

Doris Ross
A review of the record demonstrates that the trial judge did not abuse his discretion in granting the state's challenges for cause as to each of the prospective jurors in dispute. Prospective juror Doris Ross was questioned in the first panel. Before the venirepersons came up to the jury box, each had completed a questionnaire provided by the district court. Ms. Ross's responses revealed that she does not like the idea of judging others. To many questions, including whether she had any personal or philosophical beliefs that would prevent her from rendering a fair verdict in the case, she answered, "Not sure." During examination, Ms. Ross was equally non-committal:
A: That's what I'm not sure about. I mean, possibly I could, like what he said, you know, once I had heard all the proof. But I'm not absolutely sure that I could do that. I mean death. Ooh, that's just aso final....And at this point, I think maybe I could. Butbut what if I got there, and I said, `I can't do *794 this,' you know. I'm just not sure enough about something that final, making a decision on it.
At one point, she seemed to indicate that if the victim were an elderly person such as her father, she would probably be "gung ho" and could make this decision. However, she again equivocated. She further indicated that she had strong religious beliefs and that it would be hard for her to make a decision..
In granting the state's challenge for cause, the trial judge noted in Ms. Ross "an interminable vacillation that was inconclusive" given its depth and severity.

Mabeline White
Next, defendant complains about the trial court granting the state's cause challenge as to Mabeline White, also in the first panel of prospective jurors. On her juror questionnaire, Ms. White indicated that the only book she reads is the Bible and that she feels that "God is the only one to judge." She also answered affirmatively when asked if she had any personal or philosophical feelings that would impair her ability to render a fair verdict. During voir dire, she elaborated:
A: I, myself, don't want to judge. I'm afraid to judge. I don't know. It'sI can't put it in words, butLord, have mercy Jesus. Judging, I think I'm going to have a problem with that.
Q: Okay.
A: Because my God says, "Judge ye not and ye shall not be judged."
Q: Okay, ma'am.
A: And that's my belief. I have aI'm justcan't do it.
Even after defense attempts to rehabilitate Ms. White, she stood firm in her conviction that she did not want to judge. In granting the state's challenge for cause, the court noted that it found the woman so distraught that she was beyond rehabilitation.

Emma Rachal
Finally, defendant claims that the trial court erred in granting the state's challenge for cause as to prospective juror Emma Rachal. On her juror questionnaire, she wrote that she is Catholic and has a Pro-Life bumper sticker on her car. She also advised the court that she would feel guilty about imposing the death penalty. She went on to state:
A: I don't think that I have the right to condemn somebody else to death, and that would be what I would be doing in one sense.
Q: You're crediting that to a moral belief?
A: Well, moral or religious.
Q: Okay.
A: I don't believe it's in my hand to do this. I mean, the other things I would feel sort of okay about doing. But this is one thing that I don't know if I would feel comfortable doing this.
Ms. Rachal also indicated that if the defense did not put on a case, she would have problems with defendant's Fifth Amendment presumption of innocence.
In each of these instances, the prospective jurors expressed views that would prevent or substantially impair them from making impartial decisions as jurors, and thus the trial court's decision to grant the state's challenges for cause as to each is supported by the record. This assignment is meritless.

Assignment of error no. 13
Defendant urges that the trial court erred in refusing to grant the defense's cause challenge of two potential jurors, D'Juana Hinkley and Charles Fussell, who both admitted to being predisposed to the death penalty, thus compelling him to squander two peremptory challenges and denying his constitutional right to his full twelve peremptory challenges.
Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant has *795 exhausted his peremptory challenges. State v. Robertson, 92-2660 (La.1/14/94); 630 So.2d 1278, 1280; State v. Ross, 623 So.2d 643, 644 (La.1993). An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. State v. Cross, 93-1189 (La.6/30/95); 658 So.2d 683, 686; State v. Bourque, 622 So.2d 198, 225 (La.1993). A trial court is vested with broad discretion in ruling on challenges for cause and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. Cross, 658 So.2d at 686-687; Robertson, 630 So.2d at 1281. A trial judge's refusal to excuse a prospective juror for cause is not an abuse of his discretion, notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, when subsequently, on further inquiry or instruction, the juror "has demonstrated a willingness and ability to decide the case impartially according to the law and evidence." State v. Claiborne, 397 So.2d 486, 489 (La.1981).
In the instant case the defense exhausted its peremptory challenges. Consequently, prejudice must be presumed from any error by the court in ruling on the defense cause challenges, and this Court must review the denials of the defendant's cause challenges on the merits.
As discussed above, the proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Witt, 469 U.S. at 424, 105 S.Ct. 844; Sullivan, 596 So.2d at 186. In a "reverse-Witherspoon" context, the basis of the exclusion is that the juror "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him ..." Robertson, 630 So.2d at 1284. If a prospective juror's inclination toward the death penalty would substantially impair the performance of the juror's duties, a challenge for cause is warranted. Ross, 623 So.2d at 644.

D'Juana Hinkley
Defense counsel challenged Ms. Hinkley for cause based on her alleged predisposition toward imposing the death penalty once a finding of guilt was made. However, this position is not supported by the record. For example, on direct, Ms. Hinkley responded as follows:
Q: Okay. Tell me about how you feel about the death penalty. Can you just give us a rough idea?
A: I believe in the capital punishment. I'dnot given lightly, mind you. Not just say, oh well, let's do this. No.
Q: Do you think every murder justifies capital punishment?
A: No.
Q: Could youif we got to that stage, and we're assuming a lot now. State proved its case beyond a reasonable doubt, and the jury unanimously returned a verdict of first degree murder. Could you, at that point, weigh either punishment, either life or death penalty? Give equal consideration to both of them?
A: Yes.
On cross, Ms. Hinkley responded as follows:
Q: And if you make the decision that he's guilty of first degree murder, would you be more inclined, at that point, to give the death penalty than to consider the alternative, which would be life imprisonment?
A: Most likely. Yes.
Q: You think you would be more inclined toward the prosecution once you had made the decision as faron the guilt or innocence stage, is that right?
A: Yes.

*796 Q: Okay. Would you require the defendant to showshow why he should not be put to death?
A: No.
Q: But you still feel that you would be more inclined toward the death penalty once you had made that decision that he was guilty of first degree murder?
A: Yes.
Q: Could you tell us why? And I know I'm putting you on the spot, and I hate to put you on the spot, but.
A: Well, if he's done something, or if you've murdered somebody and, you know, with all intentions of that's what you were going to do, yeah, you have to pay for it.
Q: Okay. And when you indicate you have to pay for it, are you indicating that when you have to pay for it, that in most of the cases the appropriate penalty is death?
A: Most. Not all.
Q: Most. But not all.
A: Right.
The parties recalled Ms. Hinkley for a separate voir dire and clarification of her responses. She again indicated that she could consider both life imprisonment and death, and that she would follow the judge's instructions. The court then denied the defense challenge for cause because the prospective juror "left the door open" for a fair and impartial evaluation of the evidence during the penalty phase. Afterward, counsel excused Ms. Hinkley peremptorily.
Next, defendant complains that the trial court forced the defense to exercise a peremptory challenge as to venireperson, Charles Fussell, based on an alleged predisposition to voting for the death penalty upon conviction of first degree murder. However, Mr. Fussell's voir dire responses do not merit a challenge for cause. First, the court posed general voir dire questions to the panel and Mr. Fussell indicated that while he believed in the death penalty, he would want to be sure before imposing it "where I could sleep at night."
The prosecutor further examined Mr. Fussell:
Q: ... Now assuming we're able to prove an aggravating circumstance to you beyond a reasonable doubt, are you telling me then you could consider returning a verdict of death?
A: Yes, I could.
Q: Now could you also consider the other option, life imprisonment?
A: Is that going to be an option? I mean, I....
Q: Those are your options, death and life. What I'm trying to find out, would you equally consider the two?
A: Yes, I would equally consider the two. Although I believe that when you takeI mean if it's proven that you've taken a life, II mean, I would really feel like that you should give a life for a life.
Q: Okay. Well, let me ask you this. Inin all first degree murder cases, do you think that death is the appropriate sentence all the time?
A: No.
Q: Okay. So there are situations where you would envision life imprisonment?
A: Yes.
On cross, when asked if he would feel predisposed to give death, Mr. Fussell responded:
A: No, I would not. I mean I would give it equalit would have to be dependmy feelings, me personally, it would have to be the case. I mean if it was a drive-by shooting, if it was a, you know, or vengeance kind of murderI mean, it all depends on what the case was about. But I don't really think I would have a leniency one way or the other, although I do believe in capital punishment.
Q: In short, it wouldn't be an automatic decision for you.

*797 A: No, it would not.
In refusing to grant the defense challenge for cause, the court found that Mr. Fussell would not rule out consideration of life. The defense then used its last peremptory challenge on Mr. Fussell.
In situations similar to those presented by the instant case, this Court has reversed convictions on three occasions. In State v. Maxie, 93-2158 (La.4/10/95); 653 So.2d 526, 534-38, the Court vacated a first degree murder conviction and death sentence because the trial judge erroneously denied a defense challenge for cause of a venireman who, though he said he "could listen" to mitigation evidence, felt death the only appropriate punishment "[o]nce the crime guilt is established." In Robertson, 630 So.2d at 1281-84, the Court vacated a first degree murder conviction and death sentence because the trial judge erroneously denied a defense challenge for cause of a venireman who, though he stated he could perform his duties according to the judge's instructions, nonetheless stated he had his "opinion" on the appropriateness of the death sentence for double murder. In Ross, 623 So.2d at 645, the Court vacated a first degree murder conviction and life sentence because the trial judge erroneously denied a defense challenge for cause of a juror who said he could "consider" both the death penalty and life imprisonment but "personally" had his "vote" for capital punishment as "the only penalty" in a murder trial.
The instant case is distinguishable from Maxie, Robertson, and Ross in that Ms. Hinkley and Mr. Fussell did not indicate that their minds were set on death. The record reflects that neither Ms. Hinkley nor Mr. Fussell should have been excluded under Witherspoon/Witt, and thus, the trial judge did not abuse his discretion by denying the defense challenges for cause as to both prospective jurors. This assignment lacks merit.

Assignment of error no. 14
In this assignment, defendant contends that the trial court erred by not providing the jury with complete voir dire instructions and by allowing the parties to present the law. In defendant's view, the trial court had a responsibility to explain all terms of art at all stages of the trial, which it abdicated. Instead, defendant claims that the parties were left to provide the jury panels with partisan interpretations of the law, without the court enlightening the panels as to the "official" version of the law they were to follow. Thus, any answers relative to their ability to follow the "law" could not be considered reliable. Finally, defendant complains that at the time of the trial court's closing instructions to the jury, it did not cure any misinformation by instructing that all other instructions given by the parties were to be disregarded.
In support of these contentions, defendant points to four prospective jurors whom he believes did not understand the law: Linda Paul, Elvis Laborde, Crawford Brown, and D'Juana Hinkley. However, the record reveals that the trial court did in fact instruct the jury at critical stages of the capital trial.[5] Furthermore, defendant fails to point specifically to any misstatements of the law made by the state. In any event, this Court has consistently held that misstatements of the law by the district attorney during voir dire do not give rise to reversible error when the trial court properly instructs the jury. State v. Cavazos, 610 So.2d 127, 128-29 (La.1992); State v. Brogdon, 457 So.2d 616, 630 (La. 1984); State v. Edwards, 420 So.2d 663, *798 681 (La.1982); State v. Belgard, 410 So.2d 720, 725 (La.1982); State v. Holmes, 388 So.2d 722, 727 (La.1980).
Generally, La.C.Cr.P. art. 786 provides that the court, the state, and the defendant shall have the right to examine prospective jurors and the scope of the examination shall be within the discretion of the court. See, e.g., State v. James, 459 So.2d 1299, 1305 (La.App. 1st Cir.1984) (no error for prosecutor to read statute defining charge during voir dire or to explain the concept of general and specific criminal intent to the panel), writ denied, 463 So.2d 600 (La. 1985). A review of the voir dire record on the four prospective jurors defendant names in this assignment shows no abuse of discretion or even any confusion on the part of the venirepersons.

Linda Paul
Prospective juror, Linda Paul, was questioned in the first panel. Before the attorneys questioned the panel, the judge propounded questions, en masse, as to general concepts, including presumption of innocence. On cross, Ms. Paul indicated that she would want to hear both sides of the story before she made up her mind.
Another prospective juror then queried, "I believe he instructed us a while ago that the burden of proof was on the prosecution. Is that correct?" Counsel responded, "That's most likely correct." At which point the trial judge interjected, "That is correct. Don't be misled. That is the law. The State has the burden of proof."
Following this instruction by the court, Ms. Paul later elaborated, "Well, if I listen to the State and I heard all of their facts, and thenand the Defense didn't say anything, I would have to wonder. It would probablyit would be a tough decision."
The defense challenged Ms. Paul for cause on a variety of bases before seizing on defendant's right not to testify. The judge then chided counsel for presenting confusing hypothets to "people who do not have legal training in the law ... [and who] have not been fully instructed," but went on to grant the challenge for cause. However, the state countered that counsel had confused the panel by achieving a chain reaction of prospective jurors answering that they would like to hear both sides. The state then reminded the judge that he had instructed the panel that the state bears the burden of proof and defendant does not have to do anything. Based on this exchange, the judge withdrew the original grant of defense's cause challenge as to Ms. Paul and counsel exercised a peremptory challenge to excuse her.
The challenge for cause was properly denied, and in this instance, defendant's assertion that the court failed to instruct the jurors is not supported by the record.

Elvis Laborde
Defendant next complains that prospective juror, Elvis Laborde, was insufficiently instructed. Following a defense challenge for cause as to Mr. Laborde on grounds of defendant's Fifth Amendment right against self-incrimination, the prosecutor offered that the prospective juror was never instructed on the law that he must not hold defendant's silence against him. Mr. Laborde was then returned to the courtroom for individual questioning on this issue, where he again responded that he felt that defendant should testify. The court then granted defendant's challenge for cause. In this instance, no error is perceived in the court's ruling, nor any prejudice to defendant from any failure by the court to instruct the panel.

Crawford Brown
After no responses by prospective juror, Crawford Brown, qualified as grounds for a cause challenge, counsel seized on one of Mr. Brown's early statements that he would wonder why the defendant did not testify. Counsel then attempted to remove him for cause. The court countered, "Could it be because he doesn't understand the law; he hasn't been instructed in the law yet?" Defendant seems to take the court's remark to *799 the attorneys at sidebar as some type of admission that it should have been instructing the jurors. However, Mr. Brown immediately rehabilitated himself (after making the statement that he would wonder why defendant did not testify), evidencing an understanding that the burden of proof rests with the state. The judge denied the challenge for cause and counsel then exercised a peremptory challenge. Nothing in Mr. Brown's responses merited excusal for cause and the court did not abuse its discretion by denying defendant's cause challenge. Moreover, nothing in Mr. Brown's responses evidenced confusion that could have been clarified by further instruction from the court.

D'Juana Hinkley
Finally, an argument broke out between the parties at their sidebar selection process requiring prospective juror, D'Juana Hinkley, to return to the courtroom for further questioning. The parties sought clarification on whether after finding the defendant guilty in the first phase, she would be more prone to return a verdict of death in the penalty phase. The prosecutor then urged the judge to instruct Ms. Hinkley as to what the standards are in the penalty phase. The court admonished that it was not going to give her any more than the others had upon which to respond to the same questions, and "I did not instruct the others as to the law."
This exchange is nothing more than the court refusing to particularize voir dire for the parties. Upon Ms. Hinkley's return to the courtroom, both the state and the defense were given an opportunity to reinterrogate her. The court then denied the defense's cause challenge, as discussed previously. Ms. Hinkley is an example of both sides failing to pin the prospective juror down and definitively lock her into an answer to the question of whether she would be predisposed to return a verdict of death, assuming she had found defendant guilty, which is a shortfall on the parts of the attorneys. However, defendant demonstrates no confusion that further instruction by the court would have cured.
In any event, while La.C.Cr.P. art. 802 requires the trial court to charge the jury as to the law applicable to the case, the normal order of trial places the court's charge after closing arguments by the parties. La.C.Cr.P. art. 765(7); art. 801. See also State v. Brown, 245 La. 112, 157 So.2d 459, 460 (1963) (defendant's request that court charge jury before swearing of first witness and before any evidence adduced was properly refused). At any rate, at no point during voir dire, did counsel request special instruction by the court on the law of the case, nor did counsel object to the absence of such instruction. La.C.Cr.P. art. 807; art. 841; State v. Taylor, 93-2201 (La.2/28/96); 669 So.2d 364, 367-69 (reviving contemporaneous objection rule for guilt stage even in capital cases). Accordingly, there is no error for this Court to review, and this assignment is without merit.

GUILT PHASE ISSUES

Assignment of Errors Nos. 5 and 8
Defendant claims that the only evidence presented by the state to connect him with the first degree murder is the bargained for testimony of co-indictee, Jerry Joseph. In defendant's view, the state presented no forensic evidence or eyewitness testimony placing him at the crime scene. Thus, his conviction and sentence rest on insufficient evidence.
"In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in Jackson v. Virginia, 433 [443] U.S. 307[, 99 S.Ct. 2781, 61 L.Ed.2d 560] (1979).... [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements *800 of the crime had been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La.1984).
In the instant case, the state points out that, contrary to defendant's assertions, the testimony of Jerry Joseph was not the sole evidence presented to convict defendant. First, the testimony of Ricky Swafford corroborated Jerry Joseph's testimony. Swafford testified that he overheard a conversation that took place a few nights before the murder in which Freddie Gradley, Lonnie Simmons, Joseph Green, and defendant discussed killing Mrs. Rabalais. Swafford testified that defendant was "down with it," meaning that he was willing to do it. Swafford further testified that on the morning of the killing he saw co-defendant Freddie Gradley in the alley approximately two houses down from Mrs. Rabalais' house and that Gradley had red stains all over his t-shirt.
Likewise, Jerry Joseph reported a similar conversation that took place the night before the murder at the Eat A Bite Club, in which Cedric Howard and Fredrick Gradley were planning to break in to "some woman's" house on Kelly Street. He named the participants present at the murder, which coincided with those named by Swafford, and added additional perpetrators, Joe General, Mike Elie, Daveon McCullough, Fred Bush, and an unknown individual.
In addition, Jerry Joseph testified consistently with the physical evidence found at the scene, as well as with the testimony of other witnesses. For example, he testified that the defendant had a screwdriver, and Lonnie had a cord,[6] and that some of the other participants had brought rubber gloves[7] to use after entering the house. Jerry Joseph described the events inside Mrs. Rabalais' house by stating: "When I went up in the house, I seen my home my boy, Joe General, hit this lady. She was hanging on Fred. And that's when I seen Ced [the defendant] hit her in the head with a pipe." He further testified that after Mrs. Rabalais fell to the floor and Daveon picked her up, Lonnie Simmons hit her in the face with his fist and Joseph Green kicked her in the face.[8] Jerry Joseph indicated that the perpetrators had crowded around the victim in a circle. Lonnie Simmons had found some money, out of which Jerry Joseph was paid $50. At some point, Daveon McCullough got cut by the knife that Fred Gradley was wielding, and in response he took a stick and started swinging at various objects in the room.[9] Finally, Jerry Joseph testified that when he left the scene, that Joe General was wiping down the walls and anywhere they might have touched with a towel.[10]
The defense took several opportunities to attack Jerry Joseph's credibility, claiming that after he was targeted as an initial suspect in the murder, he cut a deal with *801 the state. Counsel also exposed the witness as a career drug dealer, a gang member, and a daily marijuana user. Counsel also got Jerry Joseph to admit that he had consumed two 40 ounce beers at the time of the murder and that he had originally lied to his lawyer about the case, when he initially claimed an alibi. Finally, he acknowledged that his main interest is protecting himself and his family "at all costs."
The jury evidently made a credibility determination and found Jerry Joseph's testimony convincing, as corroborated by other witnesses' testimony, and by the physical evidence. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." State v. Mussall, 523 So.2d 1305, 1310 (La.1988). In the instant case, the evidence shows that a rational trier of fact could have believed that the state adequately established the elements of first degree murder beyond a reasonable doubt.

Assignment of Error No. 6
Defendant maintains that the trial court failed to instruct the jury on its duty to assess the evidence in light of the testimony of an uncorroborated plea-bargaining co-defendant, thereby depriving him of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the attendant provisions of the Louisiana Constitution. Br. at 14.
Defendant relies on State v. Schaffner, 398 So.2d 1032, 1035 (La.1981), in urging that where the state's case turns upon the uncorroborated testimony of an accomplice, the trial judge should instruct the jury to treat such testimony with great caution. See also State v. Murray, 375 So.2d 80, 88 (La.1979); State v. May, 339 So.2d 764, 774 (La.1976). However, when the accomplice's testimony is corroborated by other evidence, such language is not required. Schaffner, 398 So.2d at 1035; State v. Washington, 407 So.2d 1138, 1147 (La.1981); Murray, 375 So.2d at 88.
As an initial matter, defendant's trial counsel did not request a special instruction concerning uncorroborated accomplice testimony and did not object to its omission from the trial court's general instruction given at the close of the guilt phase. Thus, counsel waived any claim based on it. La.C.Cr.P. art. 807; La. C.Cr.P. art. 841; State v. Taylor, 93-2201 (La.2/28/96); 669 So.2d 364, 367-69; State v. Harris, 383 So.2d 1 (La.1980); State v. Rayford, 348 So.2d 990 (La.1977). Notwithstanding the procedural bar, defendant's assertion fails on the merits.
As fully set forth previously, Jerry Joseph's testimony was corroborated in material aspects by the testimony of other witnesses and by the physical evidence found at the murder scene. Jerry Joseph conveyed "insider" knowledge of the details of the crime, the descriptions of which matched details provided by the investigating officers and by the victim's relatives. Numerous photographs introduced into evidence reflect the specificity of Jerry Joseph's testimony. Accordingly, the court properly omitted the cautionary instruction on uncorroborated accomplice testimony and this assignment is without merit.

Assignment of Error No. 7
In this assignment, defendant claims he was denied his right to the effective assistance of counsel because there was no request that the trial court instruct the jury to assess the evidence in light of the testimony of an uncorroborated plea-bargaining co-defendant and no request for either a motion for judgment of acquittal under La.C.Cr.P. art. 821 and/or a motion for new trial under La.C.Cr.P. art. 851.
A defendant's right to counsel is guaranteed by the federal and Louisiana *802 Constitutions. U.S. Const. Amend. VI; La. Const. art. I, § 13. As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted. State v. Hamilton, 92-2639 (La.1997); 699 So.2d 29, 31; State v. Sullivan, 596 So.2d 177 (La.1992); reversed on other grounds, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993); State ex rel. Bailey v. City of W. Monroe, 418 So.2d 570 (La.1982); State v. Prestridge, 399 So.2d 564 (La.1981).
In the present case, the record does not contain sufficient evidence to resolve defendant's ineffective assistance of counsel claim on direct review. Defendant may re-raise this issue by application for post conviction relief in the trial court if he so chooses.

Assignment of Error No. 15
In this assignment, defendant claims that the trial court committed reversible error when it improperly admitted a video of the decedent at a family reunion during the guilt phase of the trial. The portion of the videotape admitted depicts the victim, surrounded by family members discussing the family's history, including the victim's birth in 1911. Defense counsel objected to the videotape's admission on the dual bases that it was cumulative and highly inflammatory, arguing that the state's real purpose for the admission was for victim impact. In response, the state claims that it introduced the videotape to prove the victim's age to meet its burden of proof for that statutory element under R.S. 14:30(A)(5). Additionally, the state suggests that the videotape "placed a face on the victim for the jury to observe" and made it possible for the jurors to assess her size relative to defendant. During a bench conference, defense counsel offered to stipulate to the age of the victim. The state countered by analogizing to State v. Bourque, 622 So.2d 198, 236 (La.1993), in which this Court confirmed its oft-stated view that a "defendant cannot deprive the State of the moral force of its case by offering to stipulate to what is shown in photographs." Here, the trial judge overruled defendant's objection and the state played a portion of the tape for the jury, stopping the tape immediately after the victim stated her age.
Defendant argues that admission of the videotape was clearly erroneous because the danger of unfair prejudice of showing the sentimental videotape far outweighed the videotape's probative value. Defendant points out that the evidentiary value of the videotape was cumulative in light of other evidence establishing the victim's age, including the testimony of the victim's relative, Leta Juneau; the testimony of the church bookkeeper/secretary, Danita Coco; church records; and victim's baptismal certificate.
Defendant acknowledges that this is the very tape and the very same issue that this Court recently addressed in the appeal of his severed co-defendant, State v. Gradley, 97-0641 (La.5/19/98); 745 So.2d 1160. There, the Court held that "even if admission of the brief portion of the videotape was cumulative, there was no prejudice to defendant." Gradley, 745 So.2d at 1169. The same reasoning applies with equal force in this case. This assignment lacks merit.

Assignment of Error No. 20
In this assignment, defendant asserts that the trial court erred when it allowed unsubstantiated, speculative opinion testimony. Specifically, defendant complains that the state presented testimony from Ricky Swafford in which he recounted a conversation he, Swafford, had overheard about killing Mrs. Rabalais. Swafford testified that defendant "indicated" that, as to the plans, defendant was "down with it," meaning that he was willing to do it.[11] *803 Defense objected that the witness's interpretation constituted hearsay testimony and that there was no foundation for the witness's knowledge of defendant's state of mind.
At the guilt phase, Ricky Swafford, a 14-year-old who lived one block from the victim, testified that a couple of nights before the murder, he was a party to a conversation that took place at Lonnie Simmons's house. Swafford named the other parties to the conversation as Freddie Gradley, Lonnie Simmons, Joe Green, and Cedric Howard, stating:
Q: And was Cedric Howard part of that conversation?
A: Yes, sir.
Q: Okay. Did you hear Cedric Howard say things in the conversation?
A: Not really.
Q: Okay. What was the conversation concerning?
A: About killing Mrs. Rabalais.
* * *
Q: Now at any time during that conversation concerning killing Mrs. Rabalais, did Mr. Howard indicate that he was with that? Did he say anything about it?
A: Yes, sir, he was down with it.
Q: Okay. You're saying he says he's "down with it." What does that mean? I mean, you using the term mean?
A: Like when I say "he's down with it," it's like he goinghehe with it.
Q: He's willing?
A: He's willing to do it.
Q: And was everyone in that conversation down with it?
At this point, defense counsel objected to the lack of foundation for the witness to have knowledge delving into the states of mind of the participants in the conversation. The thrust of the defense argument is that if, as Swafford testified, defendant Cedric Howard did not say anything in the conversation, there is no way the witness can know whether defendant was "down with it" except by speculation. The trial court overruled the objection finding that Swafford was a party to the conversation, and in conversation, "people converse other than by language, body language, participation, etcetera."
La.C.E. art. 701 provides that a lay witness may give testimony in the form of opinions or inferences which are rationally based on the perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. See State v. Chapman, 96-0152 (La.App. 3d Cir.10/9/96); 683 So.2d 1236, 1243, (witness' testimony that defendant did not appear disgusted upon looking at photographs of naked teenage girl involved reasonable inference based on witness' observations and was admissible), writ denied, 97-0583 (La.9/5/97), 700 So.2d 505; State v. Williams, 615 So.2d 1009, 1020-21 (La.App. 1st Cir.) (eyewitness permitted to testify that in her opinion armed robbers would shoot her because she had seen them), writ denied, 619 So.2d 543 (La.1993); State v. Bailey, 470 So.2d 342, 346-47 (La.App. 5th Cir.1985) (lay witness' understanding of conversation with defendant admissible because based on facts from witness' personal knowledge); see also State v. Alexander, 430 So.2d 621, 623-24 (La.1983) (a witness may not be asked "whether in [his] opinion a shooting was accidental," but may relate his "observations of the occurrence" and testify that, "No, it didn't seem like [the shooting was] an accident."). Further, a witness may testify to a matter based on personal knowledge. La.C.E. art. 602.
In the instant case, Ricky Swafford merely testified to the reasonable inferences drawn as a participant in a conversation with defendant and others. His common sense understanding of the sentiments expressed by the conversants was admissible under La.C.E. art. 701. There is no error *804 in the trial court's ruling to admit Swafford's testimony on this point.

Assignment of Error No. 22
In this assignment, defendant argues that the trial court erred when it instructed the jury at the close of the guilt phase on the definition of first degree murder and included the penalties associated with the underlying felonies. Specifically, the state charged defendant under R.S. 14:30(A)(1), with the killing of a human being when the offender has specific intent to kill or inflict great bodily harm and is engaged in the perpetration or attempted perpetration of an aggravated burglary, armed robbery, first degree robbery, or simple robbery.[12] After reciting the penalty provisions for first degree murder as either life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence, or death, the court went on to define the underlying felonies relative to the charges under R.S. 14:30(A)(1), namely aggravated burglary, armed robbery, first degree robbery, and simple robbery. Here, as elsewhere, the court followed the recommendation of the Louisiana Judges' Criminal Bench Book. See § 10.06, vol. 2, p. 12 Cmt. (if the state relies on the felony murder provisions in R.S. 14:30, "the appropriate offense(s) must be defined"). In defining each lesser included offense, however, the court went further than the Bench Book recommends and included the penalty provision for each.
In defendant's view, the net effect of including such penalties at the close of his guilt phase was for the jury to believe that if they did not convict him of first degree murder, he would ultimately be released. He further claims that the trial court's instruction on penalties during the guilt phase violated the legislative mandate on bifurcated capital trials. See State v. Jett, 419 So.2d 844, 846-47 (La.1982) (recognizing that in bifurcated trial proceedings, the initial phase of the trial deals solely with defendant's guilt or innocence).
As an initial matter, defendant's trial counsel did not object to the instruction at trial, and thereby waived any claim based on it. La.C.Cr.P. art. 841; Taylor, 669 So.2d at 367-69; Harris, 383 So.2d at 10-11. Although Louisiana courts have sometimes waived the contemporaneous objection rule, see State v. Williamson, 389 So.2d 1328, 1331 (La.1980) (an error involving "the very definition of the crime of which defendant was in fact convicted ... is of such importance and significance as to violate fundamental requirements of due process"), this Court has also on two occasions explicitly cautioned that Williamson did not establish jurisprudentially the equivalent of a "plain error" rule created by F.R.Crim.P. 52(b). State v. Arvie, 505 So.2d 44, 48 (La.1987); State v. Thomas, 427 So.2d 428, 435 (La.1982) (on rehearing) (Williamson "should not be construed as authorizing appellate review of every alleged constitutional violation and erroneous jury instruction urged on appeal without timely objection at occurrence."); see also Belgard, 410 So.2d 720, 727 (La.1982) (to preserve issue of erroneous instruction on elements of attempted second degree murder, defendant must have objected to the charge at trial). At any rate, defendant's claim fails on the merits.
La.C.Cr.P. art. 802 requires the trial court to charge the jury as to the law applicable to the case. "Our law does not require that the judge charge the jury on penalty, nor, however, does it prohibit such a charge." State v. Blackwell, 298 So.2d 798, 804 (La.1974), cert. denied, 420 U.S. 976, 95 S.Ct. 1401, 43 L.Ed.2d 656 (1975).
The general rule in this state is that the jury need not be told of the applicable penalty on conviction because the imposition of sentence is solely within the province of the judge, and is not a function of the jury, which is concerned with the guilt or innocence of the accused. *805 ... The jury must be informed of the penalty only when the statutory offense requires a mandatory legislative penalty with no judicial discretion as to its imposition following the verdict.

State v. Albert, 430 So.2d 1279, 1286 (La.App. 1st Cir.) (citations omitted), writ denied, 433 So.2d 711 (La.1983).
In response, the state suggests that if the trial court erred, the error was harmless under the analysis articulated in State v. Cage, 583 So.2d 1125 (La.1991). See State v. Hongo, 96-2060 (La.12/2/97), 706 So.2d 419 (by definition, any error which does not constitute a structural defect in the proceedings is subject to harmless-error analysis and also subject to the contemporaneous objection rule); see also Pope v. Illinois, 481 U.S. 497, 107 S.Ct. 1918, 95 L.Ed.2d 439 (1987) (invalid instruction on the elements of an offense is harmless if the evidence is otherwise sufficient to support the jury's verdict and jury would have reached the same result if it had never heard the charge); State v. West, 568 So.2d 1019, 1023 (La.1990) (citing Pope); cf. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (as opposed to a burden shifting presumption, which still requires the jury to find the predicate facts and which may allow a reviewing court to find the error harmless when the finding of the predicate facts is the "functional equivalent" of finding the presumed fact, a misdescription of reasonable doubt "vitiates all the jury's findings" and thereby defies harmless error analysis). Procedural bars aside, the pertinent question is thus whether the jury based its verdict in this case on the instructional error. Sullivan, 508 U.S. at 279, 113 S.Ct. 2078.
In the instant case, given the evidence presented at trial supporting defendant's guilt, defendant cannot show that the trial court's arguably erroneous recitation of penalties for the underlying felonies to first degree murder under R.S.14:30(A)(1) influenced the jury and contributed to the verdict. Taylor, 669 So.2d at 375. If anything, the trial court's charge encouraged rational decision-making by the jurors, who were not likely confused by the further instruction on the penalties carried by each offense. This Court has held that the trial court's failure to define the various felonies enumerated in R.S. 14:30(A)(1) does not necessarily constitute reversible error. State v. Robertson, 97-0177, p. 44 (La.3/4/98), 712 So.2d 8, 41. A fortiori, an instruction which does define the enumerated offenses and thereby guides the jury's factual determinations should not result in reversible error solely on grounds that the court gave jurors a complete statement of the applicable law. Nor is there any evidence that the jury applied the instruction in an unconstitutional manner, as they decisively deliberated less than 59 minutes before returning a verdict of guilty as charged. Consequently, this assignment lacks merit.

Assignment of Error No. 19
In this assignment of error, defendant argues that the trial court erred when it did not instruct the jury on how to judge the credibility of expert witnesses' opinions as they relate to the factual bases of such opinions in either the guilt or penalty phase. Defendant contends that the trial court should have instructed the jury that "it must assess the credibility of his educational background, skill, and knowledge... and the factual bases upon which the expert derived his opinion."
As an initial matter, because defense counsel failed to request a special instruction regarding expert witnesses, there is no error for this Court to review. La.C.Cr.P. art. 807; Rayford, 348 So.2d at 990. In addition, defendant's failure to object to the omission bars any complaint with regard to the guilt phase of trial under Taylor, 669 So.2d 364.
In any event, defendant's claim lacks merit. A court is not required to give a special charge if the substance of the instruction has already been given in a *806 general charge. La.C.Cr.P. 807; State v. Gipson, 359 So.2d 87, 92 (La.1978).
Following the guilt phase, the judge charged:
As jurors, you alone determine the weight and credibility of the evidence. As the only judges of the credibility of witnesses and the weight their testimony deserves, you should scrutinize carefully the testimony and the circumstances under which the witnesses testify.
In evaluating the testimony of a witness, you may consider his ability and opportunity to observe and remember the matter about which he or she testifies, their manner while testifying, or any reason they may have for testifying for or against the State or Defendant, and the extent to which the testimony is supported or contradicted by other evidence.
Accordingly, no special instruction concerning the manner in which the testimony of expert witnesses should be evaluated was necessary because the general instruction given by the court was sufficient to inform the jury fully and properly. Moreover, the various expert witnesses for the state and defense testified regarding their educational background and information upon which they relied in forming their opinion which allowed the jury to assess each expert witness properly. Consequently, this assignment lacks merit.

PENALTY PHASE ERRORS

Assignment of Error No. 1
In this assignment, defendant urges that the trial court erred when it allowed defendant to be sentenced to death based upon an illegal aggravating circumstance. Defendant shows that the state relied upon his 1993 armed robbery conviction, from Cobb County, Georgia, as an aggravating circumstance, which was plain error under State v. Jackson, 608 So.2d 949 (La.1992) because the conviction was, in fact, a juvenile adjudication. The state concedes the error, but claims that reversal of defendant's death sentence is not warranted because the failure of one aggravating circumstance does not invalidate others, properly found, unless introduction of evidence in support of the invalid circumstance interjects an arbitrary factor into the capital sentencing proceeding. See also State v. Mitchell, 94-2078 (La.5/21/96), 674 So.2d 250, cert. denied, 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996).
In Jackson, this Court held that a juvenile adjudication based on armed robbery does not qualify as an aggravating circumstance under La.C.Cr.P. art. 905.4(A)(3). Jackson, 608 So.2d at 956-57. However, the state may introduce evidence of a juvenile armed robbery adjudication in the capital sentencing hearing case-in-chief to show defendant's character and propensities. Jackson, 608 So.2d at 957.
As an initial matter, counsel never objected to the state relying on defendant's juvenile adjudication as an aggravating circumstances, even though the defense had ample opportunity. However, this Court reviews errors occurring during the sentencing phase, whether objected to or not, because of the duty under Rule 28 and La.C.Cr.P. art. 905.9 to review every death sentence for excessiveness by examining the record for passion, prejudice or arbitrary factors which may have contributed to the death penalty recommendation. See Taylor, 669 So.2d at 367-69.
After deliberation, the jury found two aggravating circumstances: 1) The offender has been previously convicted of an unrelated armed robbery; and 2) the offense was committed in an especially heinous, atrocious or cruel manner.[13]
*807 Clearly the state erred in relying on defendant's juvenile armed robbery adjudication as an aggravating circumstance. However, the failure of one (or more) statutory aggravating circumstance does not invalidate the death penalty, so long as one valid aggravating circumstance remains and evidence introduced in support of the failed circumstance does not inject an arbitrary factor into the proceedings. State v. Martin, 93-0285 (La.10/17/94); 645 So.2d 190, 201; State v. Deboue, 552 So.2d 355, 368 (La.1989), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 L.Ed.2d 174 (1990). As discussed fully below, the remaining aggravator of heinousness is sufficiently supported by the record. In addition, no arbitrariness was injected into the proceedings by the state offering evidence of defendant's juvenile conviction, because Jackson approves of admitting such evidence to show defendant's character and propensity. Jackson, 608 So.2d at 956-57. Accordingly, this assignment lacks merit.

Assignment of Error Nos. 3 and 4
In these assignments, defendant contends that the trial court erred both in failing to cure an improper limiting instruction for the aggravating circumstance of "heinous, atrocious or cruel," and in failing to define "especially heinous, atrocious, or cruel" for the jury.[14] Defendant did not object to the faulty definition, request a proper limiting instruction, or object to the trial court's omission of a limiting instruction.
In Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the United States Supreme Court declared that juries require a proper limiting instruction for the "especially heinous, atrocious or cruel" aggravator to alleviate the possibility that their undefined determination would present an arbitrary and capricious sentencing determination. As did the Supreme Court in Maynard, this Court has held that the statutory aggravating circumstance of heinousness must be given a narrowing construction and that, to be valid, there must exist elements of torture, pitiless infliction of unnecessary pain or serious bodily abuse prior to death. See Brogdon, 457 So.2d at 630; State v. Sawyer, 422 So.2d 95, 101, n. 11 (La.1982). This Court has also held that the murder must be one in which the death was particularly painful and one carried out in an inhuman manner. State v. Baldwin, 388 So.2d 664, 677 (La.1980). Furthermore, a finding that the wounds were inflicted to kill, not to maim or inflict pain, may (but does not necessarily) preclude a finding of the aggravating circumstance that the murder was especially heinous, atrocious or cruel. State v. Tassin, 536 So.2d 402, 411 (La.1988).
*808 In the instant case, defendant is correct is his assertion that the trial court did not give a limiting instruction on "especially heinous, atrocious or cruel." However, defense counsel neither requested a special limiting instruction, nor objected to its omission. In any event, the court's failure to give a limiting instruction does not defeat the jury's finding of heinousness. For example, this Court recently opined:
While, ideally, the jury should be instructed on the proper narrow construction of this aggravating circumstance, Brogdon, 457 So.2d at 630, this Court has held in State v. Hamilton, 92-1919, pp. 15-16 (La.9/5/96), 681 So.2d 1217, 1227, cert. denied, 520 U.S. 1216, 117 S.Ct. 1705, 137 L.Ed.2d 830 (1997), that the fact `the jury was unaware of the narrow construction to be given the "especially heinous" aggravating circumstance [does] not result in any prejudice to defendant's substantial rights or deprive him of a reliable sentencing determination,' where there is `ample evidence of torture and pitiless infliction of pain and suffering.'

State v. Robertson, 97-0177, pp. 45-46 (La.3/4/98); 712 So.2d 8, 42, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1999)[(1998)].
The U.S. Supreme Court agrees that an appellate court may validate a faulty or nonexistent limiting instruction. Godfrey v. Georgia, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980); Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); Walton v. Arizona, 497 U.S. 639, 653-54, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). In Walton, the Court said:
[A] state appellate court may itself determine whether the evidence supports the existence of the aggravating circumstance as properly defined or the court may eliminate consideration of the factor altogether and determine whether any remaining aggravating circumstances are sufficient to warrant the death penalty.

Walton, 497 U.S. at 654[, 110 S.Ct. 3047].
Because the jury was not given a proper narrowing instruction, it is incumbent upon this Court to evaluate the record and to determine if under the facts of this case, whether the victim's murder was "especially heinous, atrocious or cruel" as narrowly defined under Louisiana law.
This Court has previously found the existence of this aggravating circumstance in cases in which the victims experienced great pain and were aware of their impending doom. State v. Rault, 445 So.2d 1203, 1219 (La.1984) (victim was raped, strangled, stabbed in the neck and shot twice); State v. Flowers, 441 So.2d 707, 718 (La.1983) (a 70-year-old widow was severely beaten, raped and strangled in her home); State v. Willie, 436 So.2d 553, 556-57 (La.1983) (victim was taken blindfolded and naked to a remote area where she was tied spread eagle, raped, and had her throat repeatedly slashed); State v. Moore, 414 So.2d 340, 348 (La.1982) (victim received thirteen stab wounds and died slowly "with awareness of her impending death").
The record in the instant case thoroughly supports a finding of torture and pitiless infliction of pain and suffering. For example, Dr. George M. McCormick, II, the forensic pathologist, testified that Mrs. Rabalais received 11 deep lacerations which went all the way through the scalp to the skull. Associated with these injuries were hemorrhaging and bruising of the brain. The doctor classified these wounds as fatal. He also described stab wounds on either side of the neck: the wound on the right side cut a major artery going to the head and one of the many wounds on the left side cut a major vein. There was also a stab wound in the left side of the chest which penetrated a lung and the heart. The doctor classified all of these wounds as fatal. However, he determined that even if Mrs. Rabalais had not been stabbed at *809 all, the blunt force trauma and beating wounds to the head would have been fatal.
In conjunction with Dr. McCormick's testimony, the state introduced autopsy photographs.[15] The doctor testified:
The first photographs show the left forearm of the deceased near the wrist. You will see that the skin is bruised or contused. It's torn. She has very fragile skin, being an elderly person, and the trauma that she's received on this arm has bruised and caused the skin to slip away.
The doctor went on the describe the presence of defensive wounds on Mrs. Rabalais' arms, as depicted in the photographs. Such wounds customarily indicate a struggle between the victim and the assailant. Photos of the victim's face show that both of eyes show deep bruising, indicating that she was struck by flat objects, such as fists. Over the entire forehead the doctor described a series of large interlocking lacerations made by a blunt object. Although these wounds were red, beneath them the doctor noted very little hemorrhaging, which indicated to him that Mrs. Rabalais was already in the process of dying when these blows were inflicted. Other photographs show the left side of the victim's face with at least five superficial stabs wounds, made with a sharp cutting object. These stab wounds penetrated the cheek and into one of the sinuses beneath the eye. The top of the victim's head exhibited the same pattern of deep lacerations as did the victim's forehead, one of which resulted in a triangular section of the victim's scalp being beaten away to expose her skull.
While the prosecutor's questions to the doctor did not focus on pain felt by the victim, it is reasonable to suppose that a knifing to the face, neck and chest, compounded by multiple blunt force trauma so severe that a chunk of scalp is torn off exposing the skull must have been excruciatingly painful. In fact, given the number and severity of the wounds inflicted upon Mrs. Rabalais, expert testimony is not needed for a reasonable lay person to find "pitiless infliction of pain and suffering."
The mental anguish that the 82-year-old Mrs. Rabalais must have undergone in being surrounded, beaten, and stabbed by at least nine men, as described in the testimony of Jerry Joseph, is unimaginable. And while this Court retreated from its original view that torture could be psychological as well as physical, see State v. Sonnier, 379 So.2d 1336, 1361-62 (La.1979), in favor of only serious physical abuse of the victim before death, see State v. Sonnier, 402 So.2d 650, 658-60, n. 1 (La.1981), cert. denied, 463 U.S. 1229, 103 S.Ct. 3571, 77 L.Ed.2d 1412 (1983), awareness of impending doom is still relevant to the finding of "especially heinous, atrocious or cruel." See Rault, 445 So.2d at 1219 (Court specifically notes victim's intense mental, as well as physical, pain during the ordeal); Willie, 436 So.2d at 557.
Even defendant's counsel was struck by the cruelty and abusiveness of the attack. For example, at the close of the guilt phase, counsel repeatedly described the attack as a heinous crime and a horrible crime. Then in his opening statement in the penalty phase, counsel voiced these concerns to the jury:
We're not indicating, at this particular hearing, that Mrs. Rabalais' death was not horrible. You saw the photographs. I would hate to die like that. I would hate to have a loved one of mine die like that.
And again, in his closing argument after the penalty phase, counsel conceded to the jury:

*810 The State has asserted that they have proven the aggravating factors in this particular case. You know, as far as the way that Mrs. Rabalais died, no one should have to suffer that way or die that way. I agree with [the prosecutor]. I still extend my sympathies to the family. No one should have to die that way.
In these instances, the jury's finding of heinousness is sufficiently supported by the record, and comports with the limiting definition provided by Louisiana law. The record is replete with "elements of torture, pitiless infliction of unnecessary pain or serious bodily abuse prior to death." Moreover, the record supports the common sense finding that Mrs. Rabalais' death was painful and inhuman. The fact that the jury was unaware of the narrow construction to be given the "especially heinous" aggravating circumstance did not result in any prejudice to defendant's substantial rights or deprive him of a reliable sentencing determination. Accordingly, defendant's death sentence is properly supported under La.C.Cr.P. art. 905.3. This assignment lacks merit.

Assignment of Error No. 11
In this assignment, defendant contends that the trial court erred when it allowed testimony from the sanity commissioners' evaluation that defendant could presently appreciate the difference between right and wrong. Defendant asserts that rather than assess his appreciation of right and wrong at the time of the offense, as the trial court had ordered, Dr. Quillin ascertained defendant's capacity at the time of the examination (October 9, 1995) which was irrelevant to the inquiry at the penalty phase.
Specifically, defendant claims that Dr. Quillin applied the "right-wrong (insanity) standard"[16] when he testified at the penalty phase, where the focus under La. C.Cr.P. art. 905.5(e) is whether, at the time of the offense, the offender's "capacity... to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental defect...." See State v. English, 367 So.2d 815, 819 (La.1979).
Apparently the state felt constrained to call Dr. Quillin during its penalty phase case-in-chief to deflect any potential concerns that defendant's aneurysm had in any way left him mentally impaired. This purpose is evident from earlier testimony that discussed defendant's paralysis and physical handicaps, which must have been obvious to the jurors. Surely the state also wanted to convey that defendant's neurological event occurred subsequent to the murder and that he was fully-functional on the day he murdered Mrs. Rabalais.
Contrary to defendant's assertions, Dr. Quillin's right-wrong assessment of defendant was not limited to the date of the exam. Rather, Dr. Quillin had been provided a previous psychiatric evaluation done by a Dr. Henderson when defendant was age 12. In interpreting Dr. Henderson's findings, Dr. Quillin noted no history of the defendant failing to distinguish the consequences of his acts.
In her closing argument at the penalty phase, the prosecutor reminded the jury of Dr. Quillin's testimony, stating, "[T]hroughout all time, Mr. Howard has had the ability to distinguish between right and wrong." This Court has previously opined:
While this is a correct statement of law insofar as the determination of whether the accused is not guilty by reason of (legal) insanity, once the accused's guilt has been established by the verdict at the merit-trial another dimension of his mental condition comes into play as affecting whether the jury shall recommend that he be put to death.... By permitting the jury to consider the mental condition of the offender as a mitigating *811 circumstanceeven though he was guilty, because his mental condition did not meet the right-wrong requirements of legal insanity, La. R.S. 14:14, it is obvious to us that the legislature intended to permit the jury to take into consideration, in deciding not to impose the death penalty, an abnormal mental condition short of legal insanity. English, 367 So.2d at 819.
Notably, in the instant case, the defense had the opportunity and did in fact fully cross-examine Dr. Quillin at the penalty phase. In its case, the defense did not call any mental health experts to testify to mitigating circumstances. In his summation, defense counsel focused more on the mitigating circumstance of defendant's youth, and never even argued mental defect.[17] In addition, the trial judge instructed the jury on the statutory mitigating circumstance relating to the offender's mental disease or defect set forth in La. C.Cr.P. art. 905.5(e). Although there is a possibility that the jury misunderstood the standard after the prosecutor argued the right-wrong standard in her closing, the record fails to reveal that the mental defect mitigating circumstance had any significance for the defense. In any event, counsel did not request that any special instruction be given to clarify that the standard for finding mitigation under art. 905.5(3) is not the same (high) standard for legal insanity, nor has defendant demonstrated any juror confusion or any prejudice. Accordingly, this assignment lacks merit.

Assignment of Error No. 17
In this assignment, defendant claims that the trial court erred when it allowed the prosecutor to refer to his personal experiences during the penalty phase, to comment on facts not in evidence, to misrepresent the evidence, and to incite the jurors' passions against crime. Specifically, defendant points to the state's opening statement in the penalty phase in which the prosecutor told the jury, "I can't think of a case that is more abominably atrocious, abominably wicked, more heinous than [this one]." Defendant challenges the statement as an improper reference to the ADA's personal experience as a prosecutor in evaluating defendant's crime against the other murders in Rapides Parish.
Defendant also disputes the portion of the state's closing argument at the close of the penalty phase, in which the ADA suggested:
[T]here has been no remorse shown. He is still proud of his gang affiliation in that he has to point it out to Warden Creecy and say, `That's my tag.'
Subsequently, in the state's rebuttal close, the prosecutor asked the jury:
Is there any change or rehabilitation in this defendant? did thisgo into this woman's home, this eighty-two year old woman's home, bludgeoning her to death, what effect did it have on him? You heard his statement a month later. He's still proud of his gang affiliation.
Defendant claims that the prosecutor's argument concerned facts not in evidence, misrepresented facts in evidence, and incited the jury's passion against crime.
As an initial matter, counsel voiced no objection to any of the arguments referenced in this assignment. While the Court gives limited review to claimed errors in the penalty phase, despite the absence of contemporaneous objection, La.C.Cr.P. art. 841(A), it nevertheless recognizes that the lack of objection is a factor to be considered in examining the impact of a prosecutor's argument and may signal counsel's belief that the live argument was not overly damaging. Taylor, 669 So.2d at 375-76, n. 10.
In any event, Louisiana jurisprudence on prosecutorial misconduct allows prosecutors wide latitude in choosing closing argument tactics. See, e.g., State v. *812 Martin, 539 So.2d 1235, 1240 (La.1989) (closing arguments referring to "smoke screen" tactics and defense "commie pinkos" held inarticulate but not improper); State v. Copeland, 530 So.2d 526, 545 (La. 1988) (prosecutor's waving a gruesome photo at jury and urging jury to look at it if they become "weak kneed" during deliberations held not improper). In addition, La.C.Cr.P. art. 774 confines the scope of argument to "evidence admitted, to the lack of evidence, to conclusion of fact that the state or defendant may draw therefrom, and to the law applicable to the case." The trial judge has wide discretion in controlling the scope of closing argument. State v. Prestridge, 399 So.2d 564, 580 (La.1981). Even if the prosecutor exceeds these bounds, the Court will not reverse a conviction if not "thoroughly convinced" that the argument influenced the jury and contributed to the verdict. See Martin, 645 So.2d at 200; State v. Jarman, 445 So.2d 1184, 1188 (La.1984); State v. Dupre, 408 So.2d 1229, 1234 (La.1982).
In the instant case, nothing about which defendant now complains exceeds the scope of proper argument under La. C.Cr.P. art. 774. First, the record is replete with evidence of heinousness. No prejudice is demonstrated by the ADA underscoring this by stating, "I can't think of a case that is more abominably atrocious...." Second, the jury could reasonably infer defendant's lack of remorse from his going on to school that morning after committing murder and the prosecutor is entitled to argue that point. La. C.Cr.P. art. 774. Third, contrary to defendant's assertions that there is no evidence that the murder was gang-related, counsel specifically asked that question of Jerry Joseph, to which he responded affirmatively. Thus, any argument addressing defendant's pride in his gang affiliation is relevant and fully supported by the record. Nothing in this assignment even suggests that the prosecutor exceeded the bounds of proper argument, much less, that the argument influenced the jury and contributed to the verdict. Accordingly, this assignment lacks merit.

Assignment of Error No. 18
In this assignment of error, defendant alleges the trial court erred when it allowed the testimony of an unqualified expert on gangs during penalty phase. Specifically, defendant criticizes the testimony of Rapides Parish Detention Center Warden Vernon Creecy, which he claims the trial court admitted as "expert" testimony on gangs and interpretation of gang graffiti. However, defendant disputes that Warden Creecy had not been properly qualified as an expert under La.C.E. art. 702 because the state failed to offer any evidence that he had attended seminars on the subject, that he had conducted interviews of gang members, that he had investigated gang activities, or that he had ever been qualified as a gang expert. Defendant thus claims that the state failed to establish that the witness had any specialized knowledge, skill, experience, training or education on the subject of gangs. Finally, defendant asserts that the testimony was highly prejudicial in suggesting that he was a gang member, which injected an arbitrary and capricious factor into the sentencing determination, with no factual foundation.[18]
*813 However, at no point during Warden Creecy's testimony did the state attempt to qualify him as an expert, or offer his testimony as such.[19] Generally, La. C.E. art. 701 permits lay witnesses to express opinions or inferences which are rationally based on the perceptions of the witness and are helpful to a clear understanding of his testimony. Additionally, law enforcement officers and corrections officers have been permitted to testify about matters learned through their experience, without qualification as an expert. See State v. Gibson, 97-0108 (La.App. 3d Cir.4/30/97); 693 So.2d 286, 290-91 (law officer may testify as to matters within his personal knowledge acquired through experience without first being qualified as expert); State v. Converse, 529 So.2d 459, 464 (La.App. 1st Cir.1988) (deputy could testify that wire found in defendant's possession in prison could be used in a dangerous manner, without first qualifying as expert; testimony based upon his personal observations as a correctional officer). Here, Warden Creecy testified that he had been dealing with gangs for the last ten years and had photographed practically all of the gang graffiti in the city of Alexandria.
Midway through his testimony, Warden Creecy produced a photograph which he had brought to court with him that day. He described the picture that he had taken as the side of an Alexandria building which had been spray painted with graffiti. He explained that the picture was of a pitchfork, which is the insignia of the Black Gangster Disciples, a gang out of Chicago, and the 2-7-4 references the letters of the alphabet B, G, D. Adjacent to those writings were the spray-painted symbols "5 2 H/ Crips," which the warden testified meant the gang Five Deuce Hoover, a gang out of California. By placing these two insignias on the same wall meant that the two gangs merged and came together as one in the city of Alexandria.
The warden further related an incident when defendant had come to his office to request contact with his family and happened to see the photograph. Defendant then told the warden, "Hey, that's my tag," which the warden interpreted to mean, "I put that there."[20]
Significantly, defense counsel raised no objection to the foregoing testimony and to the state's introduction of the graffiti photograph. On cross, counsel asked no questions about the gang-related testimony or about the photograph. In any event, Warden Creecy's interpretation of the symbolism of the photograph, as well as his interpretation of his conversation with defendant concerning the meaning of "tag" is all within the expected realm of knowledge a corrections officer would have gained after several years of experience. Thus, no error is perceived in his sharing his opinions and inferences, without qualifying as an expert.
Notwithstanding that the trial court did not err in admitting Warden Creecy's testimony as an unqualified expert, the question remains whether his gang-related testimony injected arbitrary factors into the death penalty phase, subject to this Court's review under Rule 28 and La.C.Cr.P. art. 905.9, despite the lack of contemporaneous objection. See Taylor, 669 So.2d at 367-69.
In capital cases, the required focus of the penalty phase is on the circumstances of the offense, the character and propensities of the offender, and the aggravating and mitigating factors. State v. Cooks, 97-0999 (La.9/9/98); 720 So.2d 637; State v. Comeaux, 93-2729 (La. 7/1/97); 699 So.2d 16, 26, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998); La.C.Cr.P. arts. 905.2(A), 905.4, *814 905.5. The character of the defendant is automatically at issue, whether the defendant has placed his character at issue or not. Jackson, 608 So.2d at 953; La. C.Cr.P. art. 905.2.
The United States Supreme Court has held that evidence of a defendant's gang membership may be admissible at a capital sentencing hearing provided the evidence is relevant. Dawson v. Delaware, 503 U.S. 159, 165, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992); see also United States v. Abel, 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984). The instant case presents gang-related issues. For example, Mrs. Rabalais was killed by a group of people, acting in concert, nine of whom were ultimately indicted. In addition, defendant described himself in his statement to police as a gangster from Chicago. Furthermore, during the guilt phase, Jerry Joseph testified on cross, that he "used to claim Cripp." Counsel then asked Mr. Joseph:
Q: Wasn't this whole thing gang related and stuff?
A: Well, to me it lookedyou know, it had to be gang related, you know.
Q: And you were a Cripp.
A: Not only me, you know. I used to be a Cripp.
Q: You used to be a Cripp.
A: At the time when I started selling drugs, you know, I wasn't hanging around nobody, just me and my wife.
Q: What are the colors of the Cripps?
A: Blue and white.
Q: Blue and white. Didn't you tell Mr. Wilson, when he was questioning you, that somebodymost of them showed up in blue and white?
A: Yes, sir.
The remainder of Jerry Joseph's cross-examination was peppered with questions about the various gangs in the area, as well as their initiation criteria, colors, and credos. Again, in closing argument after the guilt phase, counsel reminded the jurors, "Understand what we're dealing with here. We're talking about gang members." Thus, the prosecution established a relevant link between the instant crime, defendant's character, his sentencing, and evidence of his gang involvement.
Furthermore, the Supreme Court in Dawson left open the possibility that the wrongful admission of gang evidence at sentencing may constitute harmless error. Dawson, 503 U.S. at 169, 112 S.Ct. 1093. Given the lack of objection at the penalty phase to this evidence, harmless-error analysis may mean something more than the Chapman test of harmless error for properly preserved errors, if counsel is to have any incentive for bringing problems to light at a time when the court may still correct them. See Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (the reviewing court must be able to declare that the error was harmless beyond a reasonable doubt, namely, that no reasonable possibility exists that the error contributed to the verdict.) In the context of Rule 28 review, the existence of an arbitrary factor requires this Court to find an error of such magnitude that it undermines confidence in the jury's sentencing verdict, essentially the same kind of error that would support the prejudice prong under Strickland for claims of ineffective assistance of counsel.
The defendant cannot make that showing here.
As observed previously, the state presented sufficient evidence of defendant's guilt in the instant case. Additionally, also discussed earlier, defendant's death sentence rests on the fully supported aggravating circumstance of heinousness. Consequently, it seems fair to conclude that the admission of evidence of defendant's gang affiliation during the penalty phase did not so impact the jury's sentencing determination that confidence in the reliability of the sentencing verdict is critically undermined. Accordingly, this assignment of error lacks merit.

*815 Assignment of Error No. 23

In this assignment, defendant claims that the trial court's instructions at the penalty phase of trial require a new sentencing proceeding. Specifically, defendant complains that while the trial court gave the statutory mitigating factors, it failed to provide adequate guidance to the jury on how to consider evidence in mitigation or what burden of proof applies insofar as mitigation, i.e., at no time did the judge instruct that the jury was not required to find the mitigating circumstances "beyond a reasonable doubt," thereby creating the unacceptable risk that the jurors assumed that was the standard to apply. Further, defendant suggests that the charge may have led the jury to believe that unanimity was required in their consideration of mitigating factors, in violation of the rule of Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) and Kubat v. Thieret, 867 F.2d 351 (7th Cir.1989).
However, this Court has noted that "[t]he capital sentencing procedure does not establish any presumption or burdens of proof with respect to mitigating circumstances." State v. Jones, 474 So.2d 919, 932 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986); see also, Sonnier, 402 So.2d at 657.
In Mills, the Court found that instructions that emphasized the need for unanimity in decision making could have led jurors to believe that unanimity among the jury was required to find the existence of a mitigating circumstance. It was not made clear to the jury that any juror alone could find the presence of a mitigating factor and vote for life, thus preventing a death sentence. The Supreme Court vacated Mills' sentence on the ground that one or more of the jurors might have been precluded from considering mitigating factors. Mills, 486 U.S. 367, 108 S.Ct. at 1870.
However, the jury instruction in the instant case is unlike that Mills or Kubat. In Mills, the Court was analyzing Maryland's three-part sentencing scheme. In part one, the jury found whether any aggravating circumstances existed. In part two, the jury found whether any mitigating circumstances existed. In the final part, the jury weighed the aggravating against the mitigating circumstances. Mills, 486 U.S. 367, 108 S.Ct. at 1867-8. The error in the charge occurred because the trial judge repeatedly instructed jurors that decisions had to be unanimous without stating that the unanimity requirement was inapplicable to the second part consideration of mitigating circumstances.
In Kubat, the trial court gave this instruction: "If after your deliberations you unanimously conclude that there is sufficiently mitigating factor or factors ..." The verdict form reiterated this instruction. Kubat, 867 F.2d at 369-70. The Seventh Circuit relied on Mills to find that there was a substantial possibility that one or more of the jurors might have been precluded from granting mercy because of a mistaken belief that the sufficiency of mitigating factors had to be found unanimously. Kubat, 867 F.2d at 373.
The instruction in the instant case is distinguishable from Mills and Kubat. A fair reading of the trial court's instructions at the close of the penalty phase reveals that the judge instructed the jurors that, as to the aggravating circumstances, any finding must be unanimous and beyond a reasonable doubt. The instruction on mitigation did not include such a burden. The broad language used by the judge, particularly as contrasted with the rigid standards pronounced with reference to aggravating circumstances adequately guided the jury on the way in which mitigation evidence is to be considered. Additionally, defendant makes no showing that the jurors mistakenly applied the wrong burden in their deliberations as to mitigation. The defendant also argues that the court failed to offer jurors sufficient evidence on the concept of mitigation generally and to instruct jurors specifically as to the statutorily-defined mitigating circumstances *816 in La.C.Cr.P. art. 905.5. In Buchanan v. Angelone, 522 U.S. 269, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998), the Supreme Court held that the Eighth Amendment does not require particularized and detailed instructions addressing the concept of mitigation generally or the specific statutory circumstances, in a case in which the instructions given by the trial judge allowed jurors to consider and give effect to any and all mitigating evidence. The test is whether a reasonable likelihood exists that jurors understood the trial court's instruction to preclude consideration of mitigating circumstances. Buchanan, 522 U.S. at 270, 118 S.Ct. 757. The trial court read jurors the list of statutory mitigating circumstances provided by La.C.Cr.P. art 905.5 and expressly instructed that "you may consider any other relevant circumstances which you feel should mitigate the severity of the penalty imposed." Neither this Court's jurisprudence, see Flowers, 441 So.2d at 715-16, nor the Eighth Amendment require anything more of the trial judge. Accordingly, the assignment lacks merit.

Assignment of Error No. 24
In this assignment, defendant contends that the trial court erred when it allowed the state to diminish the seriousness of the jury's responsibility during the penalty phase of the capital trial. Specifically, defendant points to the state's opening statement of the penalty phase in which the prosecutor told the jury:
You are being put in this position because of what this thing did. You've been locked up from your families for two weeks because of what this thing did. This thing deserves the death penalty.
Defendant urges that the comments infer that the jury's job is less important, i.e., they are not there to determine the life or death of a fellow human being, but only the continued existence of a "thing."
As an initial matter, counsel stood mute during the above-quoted remarks. Despite counsel's failure to object, this Court reviews all errors occurring during the penalty phase, whether objected to or not.[21]Taylor, 669 So.2d at 367-69; La.C.Cr.P. art. 905.9; La.Sup.Ct.R. 28.
Both the United States Supreme Court and this Court have held that arguments which diminish the jury's sense of responsibility for the verdict and sentencing recommendation introduce an arbitrary factor into the sentencing phase which may result in reversible error. Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). Where these comments are lengthy or unobjected to, this Court has found them to be reversible error. State v. Smith, 554 So.2d 676, 686-87 (La.1989); State v. Willie, 410 So.2d 1019, 1034-35 (La.1982), later appeal, 436 So.2d 553 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984). Nevertheless, when the remark was so brief or innocuous that it would not reasonably induce a juror to believe that his responsibility was lessened by appellate review, the death sentence has been affirmed. State v. Jones, 474 So.2d 919, 930-32 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986); State v. Knighton, 436 So.2d 1141, 1157-58 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984); State v. Moore, 414 So.2d 340, 347 (La.1982), cert. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983).
All of the cases above deal with comments on the presence of appellate review which could correct any error made *817 by the jury. In the instant case, the prosecutor engaged in gratuitous ad hominem attacks that were unprofessional and beneath the dignity of the forum and thereby treads dangerously close to reversible error. Nevertheless, the remarks do not warrant reversible error under either the current harmless-error standards, State v. Johnson, 94-1379 (La.11/27/95); 664 So.2d 94, 100, citing Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (an error is harmless if the verdict rendered was surely unattributable to the error); see, e.g., Taylor, 669 So.2d at 375-76 (prosecutor's closing argument that returning any penalty less than death would be a "shame and a disgrace" deemed harmless), or under this Court's Rule 28 review of errors affecting the fundamental fairness of the proceedings and the reliability of the jury's sentencing verdict.
Here, the judge properly instructed the jury, after both the guilt and penalty phases, that "neither the opening statement or the closing arguments given by the attorneys are evidence and are not to be considered as evidence." The judge also reminded the jurors not to be influenced by sympathy, passion, prejudice, or public opinion. Moreover, at the conclusion of the penalty phase, the judge cautioned: "Members of the jury, I cannot impress upon you enough the seriousness of your responsibility." Giving deference to the good sensibility and fairmindedness of juries, State v. Bourque, 96-0842 (La.7/1/97); 699 So.2d 1, 15, and after reviewing the argument as a whole and the limited nature of the prosecutor's inelegant comments therein, it seems fair to determine that the comments did not influence the jury or contribute to the death sentence. Accordingly, no reversible error is shown and the assignment is without merit.

Capital Sentence Review
Under La.C.Cr.P. art. 905.9 and La.S.Ct.R. 28, this Court reviews every sentence of death imposed by Louisiana courts to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
The district judge has filed the Uniform Capital Sentence Report required by La. S.Ct.R. 28 § 3(a) and the Department of Public Safety and Correction submitted a Capital Sentence Investigation Report. See La.S.Ct.R. 28 § 3(b). In addition, the state and defendant each filed a Sentence Review Memorandum. These documents indicate that defendant is an African-American male born on June 6, 1978 in Alexandria, Louisiana, and was four months over the age of 16 at the time of the murder of Rita Rabalais, an 82-year-old white female. He is the youngest of three children born to Beatrice and Benjamin Howard. His parents divorced in 1983 when Cedric was six years old. Cedric was shuffled between his parents and his maternal grandmother, Dorothy Lucas, who died in 1994.
In July, 1990, the Rapides Parish Juvenile Court ordered defendant to undergo a psychological evaluation, which revealed an IQ of 101.[22] During his pretrial incarceration for the instant murder, defendant suffered an aneurysm in June, 1995. He had surgery and was hospitalized for about six weeks.
At the time of the instant offense, defendant was a seventh grade student at Bolton High School.[23] His school record indicates *818 numerous suspensions, unexcused absences, and periods of homebound detention. The Capital Sentencing Investigation Report notes that defendant was frequently expelled for fighting with teachers and other students.
Defendant has never been married and there is no indication he has fathered any children. He has never been employed or served in the military.
Defendant was 16 years old at the time of the instant offense, but he was tried as an adult. In addition, his juvenile record includes two 1986 arrests for shoplifting which indicate a disposition of "detained, counseled, warned and released." In 1988, he was convicted of shoplifting and placed on six months probation. In 1989, he was convicted of simple burglary and placed on six months probation. In 1992, defendant was convicted of shoplifting and placed on six months probation. Finally, in 1992, defendant was convicted of armed robbery in Cobb County, Georgia and sentenced to five years in the Georgia Department of Children, with a 12 month restricted commitment. Defendant was on probation for this Georgia offense at the time of his arrest in the instant murder. This probation was terminated unsatisfactorily after the defendant was convicted of first degree murder in this case.
As an adult, besides the instant conviction for first degree murder, defendant was arrested in 1996 for possession contraband (a concealed weapon) in the parish jail. Those charges were still pending at the time of the Capital Sentence Investigation. In 1997, defendant was convicted of simple criminal damage and sentenced to seven days in parish prison. Also, in 1997, defendant was charged with aggravated battery. Those charges were still pending at the time of the Capital Sentence Investigation.
Several co-defendants were also indicted in this offense. Their names and case status follows:
1) Fredrick Domne Gradleyblack maled.o.b. 7/21/76 (convicted of first degree murder on 8/24/96 and sentenced to death on 9/16/96);
2) Jerry Lee Josephblack male d.o.b. 10/20/71 (pled guilty to manslaughter on 8/29/95 and sentencing continued without date as part of plea bargain to testify in court against the co-defendants);
3) Joseph Thomas Generalblack maled.o.b. 10/25/74 (pled guilty as charged to first degree murder on 1/30/97 and sentenced to life imprisonment at hard labor);
4) Joseph Gene Greenblack male d.o.b. 5/1/79 (found guilty of second degree murder on 4/22/98 and sentenced to life imprisonment at hard labor);
5) Lonnie Ray Simmons, Jr.black maled.o.b. 9/27/77 (charged with second degree murder; trial set for 3/9/99);
6) Frederick Demond Bushblack maled.o.b. 8/21/75 (charged with second degree murder; trial set for 3/9/99);
7) Joseph Michael Elie, IIIblack maled.o.b. 7/15/77 (charged with second degree murder; trial set for 3/9/99);
8) Daveon Deshan McCulloughblack maled.o.b. 4/17/77 (charged with first degree murder; trial set for 1/12/99).

Passion, Prejudice, or Other Arbitrary Factors
In his Capital Sentence Review Memorandum, defendant reurges all 25 assignments of error from his appellate brief, but points specifically to the uncorroborated testimony of plea-bargaining co-indictee Jerry Joseph as injecting an arbitrary factor into his death sentence. This claim, as well as all of defendant's other claims of "passion, prejudice and other arbitrary factors" were treated and disposed of under the individual assignments of error.
Additionally, according to the state's Sentence Review Memorandum, it made no attempt to appeal to passion, prejudice or arbitrary factors. Further, racial prejudice *819 should not be a consideration, despite the fact that the victim and defendant were of different races. The victim was white; the defendant, trial judge, lead prosecutor, clerk, minute clerk and two jurors were all black. One of the two black jurors was later excused because of her affiliation with defendant's family.

Aggravating Circumstances
As set forth in Argument no. 16, defendant's death sentence rests solely on the aggravating circumstance of "especially heinous, atrocious or cruel." Defendant claims that the failure of the second aggravator found by the jury, i.e., that defendant was previously convicted of an unrelated armed robbery, leaves his death sentence hinging solely on "heinousness." In defendant's view, "heinousness" also fails because the trial court failed to provide a limiting instruction. Further, defendant claims that his sentence of death is excessive because he is the only defendant in Louisiana sentenced to death based solely on the aggravating circumstance that the crime was committed in an especially "heinous, atrocious, or cruel manner."
However, the finding of heinousness is fully supported by the record and no error under La.C.Cr.P. art. 905.3 is perceived.

Proportionality
Defendant asserts that his death sentence is disproportionate in that no other defendant in Louisiana has been sentenced to death on the sole aggravating circumstance that the crime was committed in an especially heinous, atrocious or cruel manner. The federal Constitution does not require proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). However, comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana, State v. Burrell, 561 So.2d 692, 710 (La.1990); State v. Wille, 559 So.2d 1321 (La.1990); State v. Thompson, 516 So.2d 349 (La. 1987), though the Court has set aside only one death penalty as disproportionately excessive under the post-1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." Sonnier, 380 So.2d at 9; see also State v. Wetland, 505 So.2d 702, 707-10 (La.1987) (case reversed on other grounds, dictum suggesting that death penalty disproportionate).
The state's Sentence Review Memorandum reveals that since 1976, six Rapides Parish juries (in addition to the jury in the instant case) have sentenced defendants to death. In State v. Felde, 422 So.2d 370 (La.1982), the Court affirmed the conviction and sentence of a defendant who shot and killed a police officer who had just arrested him. In State v. Moore, 432 So.2d 209 (La.1983), this Court upheld the conviction and sentence of a defendant who kidnapped, robbed, and shot to death a convenience store manager. In State v. Comeaux, 514 So.2d 84 (La.1987), the Court affirmed the conviction but reversed the death sentence of a defendant who raped and killed an elderly woman and killed her elderly sister. After a new penalty phase, another jury sentenced defendant to death and this Court affirmed. Comeaux, 699 So.2d 16. In State v. Eaton, 524 So.2d 1194 (La.1988), the Court affirmed the conviction and sentence of a defendant who planned and carried out the rape and murder of a minister to steal her car. In State v. Roy, 95-0638 (La.10/4/96); 681 So.2d 1230, the Court affirmed the conviction and death sentence of a defendant who stabbed to death his former lover's ex-husband and aunt, and slit the throats of his ex-lover and her two children; the latter three victims survived. In Gradley, 745 So.2d 1160, the Court affirmed the conviction and death sentence of one of the severed co-defendants of the instant defendant, for the same murder. A review of these other capital verdicts from Rapides Parish reveals that defendant did not receive a disproportionately harsh sentence. With the exceptions of Comeaux and Roy, the crimes' violence and depravity pale in comparison with the *820 instant offense. Since January 1, 1976, 60 other cases, besides the instant defendant and the cases of his co-defendants, originated as first degree murder charges in the 9th J.D.C., but resulted in guilty pleas or convictions for lesser verdicts.
Given the scarcity of comparable cases in Rapides Parish, it is appropriate for this Court to look beyond the judicial district in which sentence was imposed and conduct the proportionality review on a state-wide basis. State v. Davis, 92-1623 (La.5/23/94); 637 So.2d 1012, 1030-31. A state-wide review of cases, for example, reflects that jurors often return the death penalty when innocent adult victims have been robbed or raped and murdered in or near their home. The following cases, in which this Court affirmed the convictions and death sentences, involve murders of elderly victims. See Robertson, 712 So.2d 8 (defendant savagely stabbed an elderly couple to death during robbery in their home; victims were 76 and 71); State v. Tart, 93-0772 (La.2/9/96); 672 So.2d 116 (defendant bound and repeatedly stabbed elderly couple to death during robbery in their home; victims were 70 and 66); State v. Burrell, 561 So.2d 692 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991) (defendant shot couple, age 65 and 56, in their home during an armed robbery); State v. Wingo, 457 So.2d 1159 (La.1984) (defendant and co-defendant escaped from jail, burglarized the home of an elderly couple, shot each victim in the back of the head, and robbed them, taking their car); State v. Glass, 455 So.2d 659 (La.1984) (same; co-defendant of Wingo); State v. Celestine, 443 So.2d 1091 (La.1983) (defendant strangled an 81-year-old woman in her home during an aggravated rape); State v. Narcisse, 426 So.2d 118 (La.1983) (defendant repeatedly stabbed a 74-year-old woman during an armed robbery in her home). Compared to these cases, it cannot be said that the death sentence in this case is disproportionate. Nothing in any of the post trial documents filed pursuant to La.S.Ct.R. 28 warrants reversal of defendant's death sentence.

DECREE
For the reasons assigned, the defendant's conviction and sentence are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by LSA-R.S. 15:567, until either (a) the defendant fails to petition the United States Supreme Court timely for certiorari; or (b) that Court denies his petition for certiorari and either (i) defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules for rehearing of denial of certiorari, or (ii) that Court denies his petition for rehearing.
AFFIRMED.
NOTES
[*] KNOLL, J. not on panel. See Rule IV, Part 2, Section 3.
[1] Several assignments of error were not discussed in this opinion because they do not represent reversible error and are governed by clearly established principles of law. They will be reviewed in an appendix which will not be published but will comprise part of the record in this case.
[2] At the sanity hearing, the parties stipulated that Dr. Quillin is an expert in the field of clinical psychology and that Dr. MacMahon is an expert in the field of clinical psychiatry.
[3] In Bennett, 345 So.2d at 1138, this Court noted that the facts to consider in determining an accused's ability to assist in his defense include:

whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
[4] At the sanity hearing, the parties stipulated that Dr. Quillin is an expert in the field of clinical psychology and that Dr. MacMahon is an expert in the field of clinical psychiatry. The clinical findings of memory impairment related to short term, or immediate, memory. The doctor found defendant's remote memory to be reasonably intact. The doctor did caution, however, that defendant's memory lapses could be relevant should defendant decide to testify in his own defense, and under cross-examination, not remember the response he gave 30 minutes earlier. However, for practical purposes, the decision of whether to testify most likely rested on the fact that defendant had a prior felony conviction. In any event, this Court has never held that amnesia alone per se renders a defendant incompetent to stand trial. See State v. Dixon, 96-0332 (La.5/17/96), 673 So.2d 608 (Memorandum Decision).
[5] During voir dire, the trial judge scrupulously instructed each panel, before the attorneys questioned the potential jurors, using the format suggested in the Louisiana Judges' Criminal Bench Book, § 8.03 (1993). Again, upon swearing the jurors, the court gave preliminary instructions which mirror those found in the Louisiana Judges' Criminal Bench Book, § 2.01 (1993). At the close of the guilt phase, at the beginning of the penalty phase, and again at the close of the penalty phase, the court appropriately instructed the panel on the law, again using the bench book as a model.
[6] Photographs admitted at trial show that a cord was found in the closet with the victim. Thus, the physical evidence corroborates Jerry Joseph's testimony on this point.
[7] Det. John Griffith testified that the officers found a pair of rubber gloves in a trash pail in Mrs. Rabalais' kitchen. In this regard, the physical evidence, as well as the officer's testimony, corroborated the testimony of Jerry Joseph.
[8] The photographs depicting the victim's body, as well as the testimony of the forensic pathologist, confirm that the victim suffered severe beating about the head, face and eyes, just as Jerry Joseph testified.
[9] This testimony is corroborated by the physical evidence depicted in photographs of the scene. Testimony of Mrs. Rabalais' relatives also confirmed that a caddy had been knocked off the sewing machine and scattered pencils, scissors, etc., onto the floor.
[10] Several photographs show a towel left at the scene. Additionally, photographs suggest that the area was cleaned. Det. Ronald Beeson testified that numerous surfaces and pieces of physical evidence were dusted for fingerprints, but no identifiable prints were found. The physical evidence suggests a possible clean-up effort, again corroborating Jerry Joseph's testimony.
[11] Similarly, in defendant's statement, he uses the same vernacular to describe the negative reactions to the plan, "And Lonnie say, no man I ain't down with this. It's too close to my house....And I say, no man I ain't down with it. Just like that."
[12] The state also charged defendant under R.S. 14:30(A)(5).
[13] Curiously, the jury omitted from its findings the aggravator that the murder occurred during the perpetration of an aggravated burglary or armed robbery, even though counsel conceded as much in his penalty phase closing argument. The state also tried to drive the point home that it had proven this aggravating circumstance. Nevertheless, during deliberation, the jury sent a note to the judge asking, "Do we have to write all info. regarding the death penalty sentencing or can we abbreviate?" At this point, the jurors returned to the courtroom and the judge instructed that the circumstances that they find must be written out on the lines of the verdict form.

A review of the verdict form reveals that only two lines were provided in which to write out the aggravating circumstances, which may explain why the jurors opted out of finding the first (and lengthiest to write) circumstance. Whatever the explanation, this case is unique in this respect: on only one other occasion since 1976 has a jury failed to return in the sentencing phase an aggravating circumstance found in the guilt phase, and that was on retrial at the penalty phase before a different jury. State v. David, 468 So.2d 1126, 1127-28 (La.1984).
[14] The "improper" instruction defendant claims occurred during the state's opening statement in the penalty phase in which the prosecutor suggested: "Well heinous is one of the words we allall the lawyers know what th[at] means. But we really don't. The dictionary calls it abominably wicked....I can't think of any other case that is more abominably atrocious, abominably wicked, more heinous than just that one set of facts." Defendant asserts that the trial judge should have cured this misinformation.
[15] The trial court admitted the autopsy photographs over counsel's objection as to gruesomeness. In so ruling, the trial judge reasoned, outside the jurors' earshot, that the photographs "depict the actual condition of the victim in a realistic situation at the crime, the heinousness and atrociousness of the alleged crime."
[16] R.S. 14:14 exempts from criminal responsibility an offender who is incapable of distinguishing between right and wrong because of a mental disease or mental defect.
[17] Defense also alluded to defendant's affiliation with an older crowd that may have influenced his behavior. See La.C.Cr.P. art. 905.5(c).
[18] Notably, the first mention of anything to do with gangs injected into the trial came from defendant's own lips. During the guilt phase, the state presented defendant's taped statement made to police during their investigation, and provided the jurors with a transcribed copy of that statement to read along while the tape was being played. In that statement, defendant recounts a conversation he had with Fred Gradley and Lonnie Simmons in which Gradley was chastising Lonnie for not going along with the plan to murder Mrs. Rabalais, accusing him of "punking out." At which point, defendant recalled saying, "I just don't want to kill no old lady." To that defendant recalled Gradley telling him, "[M]an you from Chicago, you hard, you a gangster man what's up? I said, that don't mean nothing just cause I'm a gangster and from Chicago don't mean nothing."
[19] Warden Creecy began his testimony discussing the facts, date, and treatment of defendant's aneurysm, which occurred during defendant's incarceration.
[20] Defendant also marked his jail cell with the pitchfork insignia.
[21] In discussing the limited scope of the Court's review returned to in Taylor, the Court observed:

The lack of objection is a factor to be considered in examining the impact of a prosecutor's [] argument. Particularly, the lack of an objection demonstrates the defense counsels' belief that the live argument, despite its appearance in the cold record, was not overly damaging. Taylor, 669 So.2d at 375-76, n. 10 (citations omitted).
[22] Subsequently, Dr. Quillin evaluated defendant as part of the court-ordered sanity commission in this case and determined defendant's IQ to be 82.
[23] The Capital Sentence Investigation reflects that defendant was enrolled in Alexandria Junior High School.